Good morning. The case on our docket this morning is 20-60106, United States of America v. Norbert. Mr. Eichner. Good morning, Your Honor. Your Honor, may it please the Court, I am Andrew Eichner and I represent the United States. The District Court erred in rigidly applying the Martinez factors and its analysis of the facts of this case. Here, law enforcement in every instance acted reasonably. Their investigatory stop of Mr. Norbert was supported by reasonable suspicion based on a specific detailed complaint from apartment management describing a recurring pattern of criminal behavior that indicated the continued future of that same criminality. The information was substantially corroborated upon arrival and was certainly sufficient for reasonable suspicion. Requiring the police to have witnessed drug dealing and inherently furtive activity is the same as demanding probable cause and exceeds the reasonable suspicion requirement for an investigatory stop. The extreme and law enforcement would have been free to look in the black infinity found on the scene based on the information from the call and what they learned upon arriving at the apartments. At this time, the government waives the remainder of its time for uninterrupted opening and welcomes any questions from the Court. Mr. Eichner, do you agree that the government has a burden of proof to show that the stop was made based on reasonable suspicion? Yes, Your Honor. And there was no evidence produced that the caller left her name or any other identifying features. Is that right? No, Your Honor. So the caller, you're partially correct, the caller did not leave her name. However, there were a number of identifying features that were left by the caller. For one, she identified that she was management with the Millsaps apartment complex and that's at record at 156 and 177. We know that it was a female, that's at record at 177. She said that she was in fear and also that the residents were in fear, which is at record 157. She detailed a recurring problem that she had observed and that she had reported to other agencies. That's at record 157 and 175. Based on all this information, there was actually a large amount of information that could be used to corroborate the informant before. Is that correct? There is nothing in the record that would suggest that, Your Honor. That was for the government to show and there was nothing shown. Is that right? That's correct. So what right did the police have to assume that she correctly informed them that she was one of the managers of the apartment? Well, Your Honor, one of the things that is highlighted in the case law is that the police are allowed to rely on their experience and we're looking at the perspective from a objectively reasonable law enforcement officer. How was the experience of the officer helping decide whether this completely unknown person was telling the truth? Well, with the Heinz County Sheriff's Office that took the call, he said that and he was the one that received all this information. He spoke with her and received all the details that I just laid out, including some other details, including a very specific tip. But in his experience and training, both from his experience as a narcotics sergeant overseeing this particular department and his street experience and his classroom experience, he said that he found her to be credible based on the information that he received and then went out and almost immediately, I'm sorry, immediately was able to verify several of the details that were contained in the call that had been made. Now, the details strictly related to the description of the defendant and the car he was driving, did they not? Well, the details that were placed by the caller described a recurring pattern of illicit narcotics dealing. No, I'm talking about what was confirmed when the police arrived. Yes, so when the police arrived, they did not observe drug dealing. That is correct. And all they confirmed was that the then black man with the gold tooth was there and that the Infiniti was there when they first arrived. Is that right? So what Officer McClinton, who again was that narcotics sergeant, testified to was that when they pulled in, he observed an individual that was the other officer that testified, said that Mr. Norber was not actually with the group or he didn't see him with the group at the time that he arrived and that later on Mr. Norber came walking back to them. And so they did, they both said that they observed the vehicle right away. And when Mr. Norber, I'm sorry, when investigator Levine saw Mr. Norber coming back, another identifying that the person walking towards them was N.O. or Mr. Norber and was the owner of the black Infiniti. Okay, all right. Now I have a question. This is Judge Costa. It's a hypothetical. Let's say someone calls the police and says, I live on this street and says what the street is and says, there's a person at this address dealing drugs. Here's a physical description of him. Here's the car he's driving in the license plate. Based on that, can police go to that house, see the person matching that description, drive up in a car with the described license plate, and then do a Terry stop and a pat down of that person? So your honor, in that case, we would be dealing with a similar type of situation where we have a caller that has provided a degree of information, arguably in that case, less information than in our case. But still a degree of information that could help corroborate their identity, which does lend some credibility to the caller. And then the person, I'm sorry, you said that in that hypothetical, the person described witnessing drug dealing said, doesn't give their address of the caller because I've lived on this block for years. This person at that X address is dealing drugs and he looks like this and here's the car he's driving. And just by going there and seeing a person with that description and with the car that was identified, can the police do a Terry stop of that individual? In that case, I would say yes, but still the argument would be that the factors are slightly distinguishable and weaker than in our case. For example, in this case, we were dealing with individuals that were standing in a parking lot. We had a call indicating that those individuals were at least one of them was certainly unwelcome. And that was Mr. Norbert who was dealing. Upon arrival, there was additional corroboration by law enforcement here where they indicated that none of the individuals were tenants at the apartment complex. So we had a group of individuals that were standing in a parking lot complex where none, except for maybe one of the individuals, according to investigator, were being lived. And even that individual was identified as a squatter. And so I would say that the facts of your hypothetical are distinguishable from our case. In both cases, there would be reasonable suspicion, but reasonable suspicion is actually stronger here. Well, then my one follow-up is, isn't your position the same that the solicitor general took as an amicus in the JL case? It was rejected because the court says the United States amicus curiae says that it's enough to provide a description of a particular person at a particular location. And the Supreme Court says, no, we disagree. That's not enough and you must have some more verification of some criminality. Well, and there are kind of two factors related to the JL and the amiciae brief or amicus brief that you're referring to. First, in JL, you were dealing with a truly anonymous culprit. There was no corroboration at all of that individual's background. They were talking about their bare-bones tip and one of the distinguishing factors in that case as well is that you were dealing with a gun. And here you're talking about in your hypothetical, what sounds like a recurring pattern of drug dealing. So, in addition to the fact that here we do have some indication as to who this caller may be, if you say that they live on the same block as the individual, which suggests a personal observation of the criminality. In the JL case, again, we know nothing about the caller. We have no idea that this might be eyewitness behavior. We have no idea that this is a recurring pattern of behavior. One of the other things is that the possession of a firearm can actually have innocuous reasons as opposed to drug dealing, which is inherently criminal. So, in JL, essentially what they said was, hey, there's this young African-American who has a concealed firearm. And so, when you read JL, one of the things that the court highlights is the fact that either the person has to be under the age of 18 or they have to not have a permit in order to have a concealed firearm. And those are additional factors that would need to be corroborated and which could not be. Go ahead. This is Judge Grady. What is it about Officer McClinton's experience that allowed him to be able to make a determination that the caller was credible? What aspect of his experience allowed him to be able to do that? Judge, it would be from being a narcotics sergeant of 15 years in the city of Jackson, knowing his city and the ability to identify, you know, over the course of 15 years having, I'm sure, taken countless numbers of calls, the ability to identify what information is credible and what information has less credibility. I'm determining the credibility of the call. So, he's listening to the caller and he can tell whether the caller is lying or not? Judge, the officer testified that he found that the person who called was reliable. Well, that's a good point. Can I ask a question about that, please? The officer testified that he found the person credible, but didn't the court find that the person wasn't credible or that wasn't reliable? To what role does the court's findings about the situation? The court was free to disbelieve the officer, wasn't it? Can you help with that? And then I have a second question. Are you saying that just identifying yourself in a particular role is self-corroboration? Is that that if you say, I am in management, I am a neighbor, I am, you know, an officer of this company where this is occurring, that if you say you have a role or title, that is corroborating? And why wouldn't you be able to do that if you're, you know, a disgruntled lover or something, that you could always say that and give the description of the person and their location? So, can you answer both of those, please? Yes, Your Honor. So, first as to the question, and please correct, I know that was a lot of questions, so I want to make sure that I get all of it, Your Honor. So, the first question was regarding the court's finding about the credibility and reliability of the informant. And that's, I'm looking at a record at 86 is where the court in their order talks about that, which is actually a very short part of the opinion. But there they say the caller claimed to be in the management at the Millsap's apartment, however, there's no evidence that the deputy attempted to verify this claim or identify who. If anyone in management had made the call, based on these undisputed facts, the anonymous caller in this case was lacking in credibility and reliability. And so, what the court does there is it totally discounts all of these other additional factors. The fact that the person, the information that she provided suggests that she was an eyewitness to the drug dealing, that she had seen certain activity, which obviously from the context of the information that was being testified to was activity. In addition to the fact that information that she provided was corroborated in substantial regard immediately upon arrival, everything except the witnessing actual drug dealing was corroborated as soon as law enforcement got there. And as to the second question that your honor asked about the... But so, but wait, so we do not defer or have to find that there was some clearly erroneous deter... Do we have any kind of clearly erroneous burden here for you to win, or do you believe that's just bypass because you think that the district court wasn't thorough? No, your honor. So, the question of whether specific facts give rise to reasonable suspicion is of course a question of law. And so, that's where we're using the de novo analysis here. And since the facts are contained regarding that bit, the court is making an analysis in that section. But that analysis is the question of reasonableness, which is entitled to the de novo analysis. And so, the question of whether or not the officer actually could tell that she was credible, that is a determination for the district court at the hearing, isn't it? After hearing from the officer. Well, I believe that the court wrote in its opinion that Officer McClinton found her credible and reliable. Right. And then the court said it didn't find her that it was credible and reliable. So, you have to assume that he rejected somewhat what the officer said, don't you? Well, so his finding was that she was anonymous and that seemingly despite all of this other information, which attacks her credibility and reliability, which is what the government is suggesting. I think others have questions. So, if you could just answer my second question. I appreciate you grappling with this one. Yes, thank you, Your Honor. So, as to the second question and the identification of, you know, if a person just called in and said, hey, I'm a manager at such and such a location, you know, we have this problem here. So, ultimately, what we're looking at here is, again, it's a totality of the circumstances analysis. And so, when we're looking, one of the really important factors in these instances where we have a call and the call is such a substantial part of what law enforcement do when they arrive at the scene is about how much information can be used to corroborate various details about the anonymity of the caller, things that would tend to suggest whether the caller is an eyewitness to what had happened, whether the caller is referring to a kind of predictive value. And so, certainly one of the things that is important is if the caller is giving details that help corroborate their identity, something that puts their anonymity at risk, that that is something that does weigh in favor of finding reliability and credibility of that caller. Mr. Eichner, aren't many of these, I don't wish to be argumentative, doesn't the Navarrette case provide strong support for the government's position here, an equally anonymous tip? Yes, Your Honor, and as a matter of- And couldn't one argue that in the Navarrette case, the person who was calling might have been a disaffected lover who was going after her boyfriend who was driving the F-150 that she reported had nearly driven her off the road? I mean, was there any more reason to suspect the credibility of the anonymous tipster in Navarrette than in this case? No, Your Honor, as a matter of fact, I would say that there was less reason to believe the caller in the Navarrette case than in this case. Well, except the court found some circumstantial evidence that confirmed that the caller was who she said she was, unlike this case. In this case, the caller recorded a sudden incident where it was almost run off the road, so it was kind of a sudden emergency. It was an emergency nature of the call. A state trooper put eyeballs on the vehicle that ran him off the road 18 miles down the road, and this confirmed that the incident occurred about the time the officer received the call, and underlying all this was the fact that the officers did everything they could there to confirm that this was an incident that happened on the highway. Unlike this case, when the officers rolled out to the apartment house, they didn't even call the apartment house number and verify that the woman that somebody had called from that office was the tip. So, why doesn't that distinguish Navarrette? Thank you. So, in Navarrette, the law enforcement, and one of the things I think that can be helpful here is to look at some of the things that Justice Scalia highlighted in his dissent regarding factors that were not corroborated in Navarrette, which were actually substantially, those concerns were alleviated in this case. In Navarrette, Justice Scalia identified that we knew nothing about the tipster. Here, we know all the factors that I described earlier in the argument. In Navarrette, the Justice Scalia highlighted that there was no intimate knowledge of the incident that the person could have, as Judge Jones highlighted, been some sort of jealous lover or something that had decided that they wanted to stick it to Navarrette. Here, we have someone who has, who is an eyewitness to an observed pattern of criminal behavior. There, in Navarrette, the tipster believed that they were, or would have had reason to believe that they were anonymous. In Navarrette, the majority highlights some of this additional detail about the California 9-1-1 system. Your time is running out. I'd love to get in a question. My concern is just, is the government's position, specifically its larger rule of law, because whatever we announce will affect possibly even thousands of police citizen encounters in the Fifth Circuit every day. So, I have two questions. Yes, sir. Would you agree that if this were a pure crime stopper call where the caller is told, don't give us your name, but the caller says, this black male dealing drugs, that wouldn't be enough? In that case, if, again, it would be a question, if you were saying it was just, there's a, there's a call where you're specifically told, don't leave your name, but the tip is, this black male identifies them is dealing drugs. I think the answer is no, but, but you're pausing. So, I want to get to my second, because I'm sure all the colleagues have questions. Oppositely, when you can go back to it, if you have a yes, no answer, I just sent you pause and that's fine. It's the totality inquiry and their complexities. What I've never understood about this case is why are we dealing with drugs at all? What happens here as I see it, undisputedly, is a person on private property calls the police, says there are trespassers on our private property. The police come in the dark at night and they confirm before any Terry stop that in fact Norbert was not a reasonable suspicion alone. Take the drugs out. That is reasonable suspicion. You never, you haven't argued that. And that's a point worth making. I think that the, because the caller has focused on the drugs, that is where so much of the analysis lies, but you're right. None of these individuals had an indication. I looked at a lot of state case law and it seems to me that's what happens. Callers say, hey, there's someone on my property at night. Please come and say to this stranger found on the property. Are you lawfully on the property? They say no. Okay. You pack and you say, what are you doing here? Why isn't that this case? And I think, Judge, I think that's another way to look at this case. And I think that that's another perfectly viable reason to find reasonable suspicion. But that assumes that it's unlawful for somebody to be in a parking lot at an apartment complex. You'd have to assume that that's trespassing. Well, and Judge, of course, reasonable suspicion does not require the elimination of potentially innocent behavior. Well, isn't your answer that both officers testified and the court itself confirmed that Norbert admitted before he was patted down, he was not lawfully on that property? Correct. Counsel, can I pick up on Judge Higginson's question? Suppose there hadn't been a pat down in the, if the officers approached the men in the parking lot and saw the gun in plain view, the evidence comes in out of the plain view doctrine either way. That was the government's position. Would we be talking about Terry at all? No. So why are we talking about Terry at all since none of the evidence that is at the suppression hearing comes from the pat down? Because the district court found that it was all through the poisonous tree. But at the end of the day, the evidence comes in out of the plain view doctrine either way. That was the government's position. You didn't develop an argument that the reason that a trespasser in the district court at all. I looked at your filings and I didn't see anything about trespassers. Is that right or not? We highlighted the fact that the individuals did not have a right to, or that none of the individuals were tenants, but we did not go down into the trespasser aspect of it. Very quickly, I had the same question from the get-go. Why did you argue, you didn't seem to in your brief, you kept saying the gun was in plain view, but you don't make the argument that its discovery was totally unrelated to stopping Moore or patting him down. I mean, if you knew what the license plate number was, you knew his name, a police officer walks by and sees the gun, you've got him. I don't understand, like Judge Oldham said, why we're talking about the Terry Stop, but you didn't seem to develop that in your briefing in this court at least. Yes, Your Honor, and so our position would be, and this was something that we highlighted in front of the district court, the district court ultimately suppressed everything that's through the poisonous tree as to the Terry Stop of Mr. Norbert. But based on everything that we have seen that police were brought out to the location based on this information, and there they observed this black infinity, police had every right to go over to the black infinity, and then they would have seen the firearm in plain view. They talked about writing the tag number on the infinity and that it was lawfully found to belong to Mr. Norbert, and so that additional information would have come in. But you haven't made that argument in this court, is that correct? I believe that we did at the end of our en banc brief, Your Honor, we talked about through the poisonous tree document. So if I can follow up, because I had some of the same concerns, what, is it that the statement he made that the car was his, or that, or is it, I mean the gun itself was suppressed, but are there also statements that were made during the stop that are material to the case, the prosecution? They're not material or fatal to the case. The Eppley, Mr. Norbert, did make statements once the Terry Patdown had occurred, which would certainly inculpate him, the inculpatory. And those were suppressed? Those were suppressed, correct. Are you trying to use those? Obviously the gun is evidence, but are you trying to use the statement? The defendant also made statements later on when he was interviewed by the FBI. We wouldn't need those statements. And that actually, the 302 for the FBI officer was admitted during the hearing as well. The government on scene, as I read the transcript of the suppression hearing, Ph.D. Levine, who was one of the witnesses here, was concerned to connect the gun to Norbert's ownership. The fact that it's in Norbert's car is not necessarily enough, which is why Levine was going off to look for the keys, correct? So there was some, and Norbert didn't really admit that the gun was his until they, at some later point, right? That's correct. So he admits that the firearm is his after the Terry stop. And again, subsequently admits to it when being interviewed by the FBI after his arrest and post-mortem. Okay. One more question. Officer Levine testified that he was asked, well, why did you go to the car? And he said, well, drug traffickers carry their drugs in the car. And so we wanted to look and see if there were drugs. So if he's still searching for drugs when he goes to the car and spots the gun, isn't that part of the same chain of the investigation that led up to the Terry stop? Well, they certainly were investigating. Yeah, they were continuing an investigation that began before the Terry stop, continued throughout the Terry stop, and then proceeded to continue even after Mr. Norbert was stopped. But would they have gotten to the car without Mr. Norbert's stop? Yes, based on what they had described and the reason to investigate the drug stop. But the real reason, according to Levine, they went to the infinity to see if they could find more drugs. We know from that testimony why he went. Yes, that was one. Well, they went over there to, yes, to see if there were, if there was drug dealing activity that involved that vehicle. Okay, Charlie, would you add about five minutes to Mr. Norbert's time? Mr. Jupiter? May it please the court. My name is Omidari Jupiter. I represent the appellee of Oconlawin, Norbert. We're asking the court to affirm the district court's order granting the motion to evidence in the light most favorable to Mr. Norbert must uphold the district court's finding if there is a reasonable view of the evidence to support it. The district court was on solid ground when it concluded that law enforcement officers seized Mr. Norbert in violation of the Fourth Amendment and why this anonymous tip did not live up to the principles articulated in the Supreme All cases which this district court considered, the tipster was nameless and numberless. The government failed to establish that her reputation could be assessed at the time that the sheriff's office laid hands on Mr. Norbert and seized him, nor have they sufficiently established that this person, the tipster, could be held responsible if her allegations turned out to be fabricated. These are the Supreme Court safeguards that were put in place relating to false accusations. Mr. Jupiter, let me ask you about a couple factual points. What we know about what McClinton was told by the caller comes just from his testimony. There was no transcript or other recordation in some form at the time of the call in 2017? Yes. No, no. The factual issue of what the caller said, it seems to me that the government has interpreted McClinton's testimony to mean that the caller said, I witnessed this, where your brief says the caller should be interpreted or McClinton's testimony should be interpreted. It was just information from other people who lived in the apartments. Whether this was first-hand knowledge or not, what's your reaction to what McClinton said? I think that the very question demonstrates the problem that we have with anonymous, recorded lists, numberless calls to the sheriff's office, and it's a single call that's distinguished by many of the cases that are cited by the government. As this hearing went on, that issue became murkier and murkier as the government, as it proceeded, and it proceeded from a very vague statement by McClinton. His testimony initially was that there was illicit drug activity in the parking lot and that he received a call from management. There was nothing else about the content of the illegal content. The rest of the information went to the description of the car, as well as this later on on redirect when the government asked him whether or not this was a single incident or whether or not it was a pattern of activity. He said, I think that the callers said it had been going on for a period of time. I can't remember how long the caller said, but I think that it was going on for a period of time. So there was nothing further about the criminal activity with regards to describing it. Yes, sir. Can you help me understand, is your client's position that this particular tip was insufficient to create reasonable suspicion, or is your client's position that the police should have done more to corroborate the tip before approaching the gentleman in the parking lot? Which of those two? Yes, your honor. Actually, I don't think it's either. I think that's a good question because I don't think it's an either or proposition. I think it's a bit of both. And I think that the lack of content with regard to like innocent facts that raise suspicion goes to both the second and third factors. So while the district court found specificity under the second prong of the Martinez test, when it got to the third prong, as Judge Davis pointed out, and Judge Davis in the majority opinion below indicated that, well, the second prong, yes, you can have a tip that's specific, but it's problematic when you don't have any specifics about it when you get to that third prong. So what was the additional fact that the anonymous, let's do the two points together, what was the additional fact that the tipster should have provided that would have created reasonable suspicion? And then the second part of the question is what is the additional thing that the officer should have corroborated before approaching the gentleman in the parking lot? Well, I think the Supreme Court jurisprudence and this court jurisprudence provides a whole, a number of non-exhaustive factors that could have been done on either strengthening the traceability and accountability of the informant or strengthening the content of the tip or strengthening the verification factor after receiving the tip. And that's demonstrated. If you look at the facts that the tipster provided, she provided at least 11 different facts of who she was and what was going on. She identified herself, where she was, she identified the gentleman, she identified the car, she identified the license plate, she identified the illegal activity. If you look at cases like Navarette in Alabama versus White, they're bare bones tips. There's no identification of who the person is. There is, and there's just two or three little facts. So I'm having a hard time understanding how you can extrapolate from Supreme Court cases that say it was an F-150 at mile marker 69, like that's two facts, versus ours with 11. So I'm not sure I understand your argument on the first part as to what additional thing the tipster was supposed to provide. And the officers corroborated every single thing, I think, other than the illegal activity. The only thing they didn't see was the drugs being dealt with, sorry. Well, no, Your Honor, I think that when you're talking about a specific... So when someone says, I was just run off the road, that's very specific in terms of the legal action that occurred, not as to something that may, in fact, be a conclusion, which I think is a very reasonable view of the evidence here. And in terms of what was being in terms of whether or not someone is an eyewitness, or whether or not someone actually is conveying secondhand knowledge, or is conveying a conclusion that they reached from observation of facts that have not been articulated. That can be fine if it's a known informant. But when you have an anonymous tip that starts off with a position of mistrust, these descriptive facts don't hold much value if they don't have the predictability of future action that you had in Alabama v. White, and also in Navarrete, where you have something having immediacy. This lack of contemporaneousness in this case was very important because it's strengthened when we get to the fact of when... What does tip convey in this case? I think that one would say would be extrapolated if you were looking at the evidence in the light most favorable to the government, that the tipster was actually viewing this activity at the time she called and she was on the property. So by saying that... Counsel, I have two questions, and I didn't mean to cut off your answer, but they're actually similar to what Judge Oldham just asked to try to confirm your position. Number one, are you arguing that the tip as received should have been disregarded as insufficient, and the officers should not have acted on it? That's number one. Number two, if a tip is received and it is of questionable credibility, and the officers go to the scene that is part of the tip, can they then determine the credibility of the tip based on what they observed at that time? They can. The problem that we have is when you have a tip... So I'm not saying that the tip should be disregarded. The police can act, can investigate without crossing that Fourth Amendment line of committing a seizure. So there's nothing that keeps the police or law enforcement officers from acting on a tip. It's when the officers decide to cross the Fourth Amendment line, as the district court found that they did right when they got out there. So a lot of these facts I think that the government is pointing to were never established that they occurred before the seizure. And that's why... I mean, you heard my questions, because that last point is very important. I agree with your position in the district courts following Supreme Court law that a district court has important discretion to reject an anonymous tip about a black male drug dealer when we don't know if that's firsthand and the police can't confirm it. Or at least an appellate court wouldn't reverse that deep skepticism about anonymous tips, black male drug dealer. But you heard my concern. I think it's undisputed here, but tell me if it's not, that caller from private property said, I'm complaining about strangers on our private property. The police then respond. And before they pat him, both officers said they confirmed that Norbert wasn't lawfully on the property. My question to you is, do you have any case, state or federal, that says that is not reasonable suspicion at night in the dark for the police then to pat before they continue questioning? Can you cite me a single case because they verified the trespass and then they patted and talked? I cannot cite any case that says if the police verify a trespass, but that's not what you have in this case. What you have is the police immediately seeing three black males in a parking lot, presumably for a few seconds. There's no indication that this parking lot is closed to people who are coming there to pick people up. I'm going to interrupt you because in your brief at page 40, you said he was just hanging out and that's what you're doing now. But I'm looking at the hearing after both officers testified that only one individual said they had a connection to a father who squatted all the others. So in other words, both officers testified under oath and then the district court says, I guess if he lived at the place and he did not, I don't think there's any evidence or testimony to that effect. How is he not a trespasser? Because being on in a parking lot of an apartment complex does not make someone does not make someone who doesn't live there a trespasser. What case do you have for that? Or is that just common sense? Because I really don't think there are any cases that say that it's just private property. Or wouldn't you need a law that says it's unlawful to be in a parking lot at an apartment complex? You could have visitors, people could come over and it's unlawful for anyone to be in the parking lot in the apartment complex? Yeah. Does this state have a law that says you must have a post no trespassing sign or does the municipality have such a sign in order for there to be trespassing and is that in the rec? Do we know anything about that whatsoever? Because a number of jurisdictions have a law that they must post and you must be in violation of a posted notice. The way I would answer your question as well as the I guess the other questions that were posed here is that this is the government's burden and the burden to prove reasonable suspicion based on a trespass. And there's just nothing in the record that indicates that when the police get out, when the police come out and see some people in the parking lot and they say, hey, does anybody, hey, do any of you guys live here? We're investigating a drug, a complaint of drug dealing. Would your answer change if instead of drug dealing, the report was domestic violence? In other words, similar specificity or lack thereof in terms of the anonymous or quasi-anonymous death, basically all the same facts except instead of a drug deal or repeated drug deals, it's a report of domestic disturbance against the defendant. Yeah, I think once again, you would have to first of all, start off with the nature of the tip and the content in the tip. Right. I'm doing the same pattern here except that just the one check. What I'm trying to do is figure out to what extent this is based on some aspect about, you know, we don't necessarily worry about drug crimes as much as other crimes or what's really going on here. So take this exact same fact pattern, but the tip is instead about domestic violence, a child or a spouse reportedly being assaulted. Yeah, I would say I would still have the same position if the content of the tip was similar in nature. I think it goes to the content of the tip and I think there are also all sorts of factors that the police can testify to in particular that might strengthen reasonable suspicion, but you don't have that here. Oh, excuse me. I'm sorry to interrupt you. If you have more to say. No, go right ahead. You're very kind. Thank you. At what point exactly did the seizure occur and at what point did the police have no basis for further investigation? That's something that's, and I understand the government testified there were, agrees there was a seizure and the policemen said there was a seizure, but at what point, is it the fact that everybody got patted down for officer's safety? Is it the fact that they didn't find drugs on Norbert, although they did find saleable marijuana on the other fellow? Exactly. You know, you have to have a point at which they couldn't look into the car. Yeah. Yes, your honor. I think in relationship to that, I think that once again, the contradicting testimony presented by these two witnesses made it difficult for the district court to figure out, you know, when did, what happened first? And that was the government's burden to provide a clear picture of. We have two witnesses who say, we have two witnesses who say these things happened and neither one, for instance, throughout his whole direct testimony, never even mentioned the pat down and afterwards on cross, he says that he patted him down, but McClinton, so the district court cleared it up. The district court mentioned these two different versions and all the different versions and said that McClinton, although he referred to him as the dean, he said the person who got the tip saw that Norbert was out there right when they got out there in contradiction to what Levine said. And he adopted that, that he saw Norbert out there at that time and that they would pat it down shortly thereafter. Yes. But what I'm saying is, are you contending they had never, never had a right to pat him down? And then I follow up with this. What if they had allowed Norbert, they pat him, search him, nothing on him and just let him go and he gets in the vehicle where the gun is. I mean, does that create a problem as to why the officers ought to be allowed to search? Yeah, I'm not sure I'm understanding your question because anything that happens after the pat down necessarily, unless the government shows that the discovery is not dissipated by the chain, anything that happens after the pat down would be. So basically you're saying they had to find drugs on him in order to continue investigating? Your Honor, that's not my position at all. Our position is that the legal seat of the district court found is that the legal seizure at the time that he was, he was, well the district court said he was stopped. Now perhaps the court may say, well, at the very least we know by the time the officer lays hands on him that at that time that there's a seizure under Terry and he had to have reasonable suspicion at that time. And the government never established that a number of these things that are being cited to as corroborating were occurred before he was patted down. That was the government's burden and it wasn't for the district court to try to bring into congruence this contradicting testimony of these things that occurred beforehand. So I think what you're really saying is that the police should never have even gone out there to investigate based on that tip because he's, I thought, I thought your public defender agreed at the hearing that it was basically okay to pat them down for officer's safety at the outset. Maybe I'm misremembering that, but the pat down was for officer's safety primarily. Yeah, well, no, Your Honor, we're not saying, it's not my position that the police, you know, the police can't go out to an apartment building. It is our position that the police cannot pat people down without reasonable suspicion. And I think that that, Terry refers to that as this is not a petty indignity to lay hands on someone. And the reasonable suspicion, Mr. Jupiter, must include reasonable suspicion that the defendant is engaged in illegal activity or had been. And the sole source of that information was from the caller. Is that not right? Yes, Your Honor. The illegality in this case was reported by the caller and that was made clear that it was the caller, what the caller was reporting in terms of what the caller saw and what the caller was reporting on behalf of tenants. Mr. Jupiter, I'd like to follow up on that, please. This is Judge Duncan. Yes, Your Honor. So with respect to the tip, as I understand from your ongoing brief, one of the main cases you're relying on is JL. Isn't that right? Yes, Your Honor. Okay. And there were questions about JL from judges to the government. So in Navarat, the Supreme Court explains why the tip in JL did not justify the stop. And here's what the Supreme Court said. The tipster in JL did not explain how he knew about the gun, nor did he suggest that he had any special familiarity with the young man's affairs. As a result, police had no basis for believing that the tipster had knowledge of concealed criminal activity. Furthermore, the tip included no predictions of future behavior that could be corroborated to assess the tipster's credibility. So my question is, why isn't every single one of those factors that the Supreme Court found didn't justify the search in JL? Why isn't exactly the case here? And I'll be more specific than that. Here, the tipster clearly explained how she knew about the alleged criminal activity. She's the manager of the apartment complex. Here, the tipster suggested that she had special familiarity with what was going on. She's the manager of the apartment complex. Here, did the tip include predictions of future behavior? I think it did. When the police went out there, they found precisely the same car, make, model, license plate that the tipster had talked about. So why don't all those factors show that even in light of JL, the tip here was more than enough to justify the stop? Well, Your Honor, I think with regard to the car, the specifications of the car, even in Alabama v. White, the Supreme Court said that the police would have gone out there and found a car, this Plymouth station wagon with a broken headlight, parked outside of the apartment complex. Well, I was talking about JL, but in White, wasn't the tip found sufficient to justify the stop? Yes. Okay, I wanted to talk about all three cases, JL, Maverick, and White, because I think all of them give, because all of the cases the court cited to and said, what is this most like? Because the court said, yeah, this case has differences between JL and this is a close call. Nothing in Navarette says that you have to find, when you find some corroboration of any facts, that you have to find that there was reasonable suspicion. Navarette doesn't say that. Navarette gave very specific things that for the court to look at. But in JL, it was the court gave the information, stated that there was nothing here that related to something that demonstrated this anonymous tipster understood, had a relation, was familiar with concealed activity or suspicious activity. So, I'm sorry, I don't understand that at all. The anonymous tipster, the anonymous, even conceding that it's anonymous, said, I'm the apartment manager, there's drug activity going on in the parking lot involving this specific car with this specific license plate. Yes. Are you agreeing, let me just ask, are you agreeing that the caller said that they were the apartment manager? Does McClinton say that the caller said that she was the apartment manager? She did not. And McClinton said, he did not. McClinton said that this was a caller who identified themselves as from the management and he specifically said that he could not, when judge asked, how did you conclude that they were in fact the manager? The judge gave, the district court gave him the opportunity to explain why you believe this is in fact the manager. And he says, I can't verify that it was the manager. And, but that's who, just that, she identified herself. Was a specific apartment complex mentioned in the tip? In the, in the anonymous tip, in this case, yes. Okay. Yes. And, and so there was a specific apartment complex mentioned by a person who said they were, would you say in management? That's what McClinton testified to, that they were in management. So that, whether or not that means someone on the premises or whether or not that means that they're called the property management or whether there's any way, whether there are 10 people or 20 or a hundred people. If we don't know exactly where they were in the management hierarchy, it's not sufficient to support reasonable suspicion. What I'm saying, if we don't have enough information to where someone can trace the person who was calling to where their reputation could be assessed and where their credibility, whether they could be traced so that their reputation could be assessed and that they can be held accountable for what they reported, then you have the level of mistrust that you have in, that was enunciated in, in all three cases, all three Supreme Court cases. Counsel, I have the same concern that Judge Duncan has. So I'm hoping you can help me understand the way the precedent works in this area. What was the assertion of criminal activity in jail from the tipster? That he was in possession of a firearm. And what did the tipster say as to why the defendant in that case should not have had a firearm? I don't remember the tipster saying anything with regard to that, but the officer saw that, that was a juvenile. Yeah, it's fair that you wouldn't remember it because there wasn't a thing in the tip that said it was a crime. So there was no assertion from the tipster of criminal activity in jail. And as Judge Duncan points out, that is the distinguishing line between the two cases or between the three cases. So in Alabama versus White and in Navarrette, the tipster says, I'm anonymous. Here's the crime that's going on. And the court says that's reasonable suspicion. Whereas in Florida versus JL, the tipster never asserts that there's a crime. It just says, black man, plaid shirt, gun. That's not a crime. It is not a crime to be a black man in a plaid shirt with a gun. And that's why the court suppresses the evidence in JL. And that's what the court has explained in all the subsequent cases. So I'm having a hard time understanding why JL matters at all, given that it doesn't involve a tipster asserting criminal activity, unlike our case, Navarrette and Alabama v. White. Let me ask you this. Somewhere in JL, the court made it clear that it was a violation of Florida law to possess a firearm. So I guess we just have to assume the officer knew that. Yeah. I don't think, with all due respect to Judge Oldham, I don't think that what the court ruled on JL related to whether or not the tipster alleged illegality. I think the court honed in on the fact that there was the tip content related to location and the person. And that it's not enough to give information that just let the police know who you are, who you need to, who is the accused, or his location. And they specifically state that. And this court specifically found that there was no information that was corroborated beyond location and description of the individual. Well, the court can read to you the passage from Navarrette that interprets JL. And the way the court distinguished JL, and we're obviously bound by Navarrette, is that there is no assertion from the tipster of criminal activity. None. The tipster never says this is a juvenile. The tipster never says this individual didn't have a license. The tipster never said any, never said it was a felon, never said there was any reason that the young man couldn't have a gun in that case. And so we're obviously bound by that the other two. And I take it that your answer hinges something on the indicia of reliability of the tipster. That is, the tipster is somehow identifying him or herself. But in both Navarrette and in Alabama v. White, it's 100% anonymous. There's radically less identification of the tipster in those cases than they have here. They don't say anything about where they're from, why they would have known anything. They don't say, there's nothing left of sort of by the tipster to say, here's my name, here's where I'm from, here's why you should take me seriously. Yeah. I think that the district court was, in terms of judging whether or not this particular informant, as the court seems to be conceding that as an anonymous informant, as to whether or not there was sufficient information as to that person's traceability, or whether or not there was information conveyed that indicated that they were familiar with Mr. Norbert's concealed activity. So that's the difference that you had in Alabama v. White with somebody who was familiar with, said, look, this person's going to be leaving. They're going to be going to this location at this time. And in this case, you don't have anything about time. You don't have anything about what movement, or you don't have anything about how the crime, the alleged allegation of crime, or what they saw, how it's carried out. So that leaves very little room. The tipster says that the drug activity has been going on, quote, four days. And when the officers get there, people are exactly where the tipster said they would be, doing exactly the same parking lot, with the same license plate, and the car, and all the rest of the things the tipster said. So there is a durational component to this. She says four days. I've been begging someone to come. No one will come. Please come. Your Honor, I didn't see, while I saw that in your dissent, I didn't see that in the record that the tipster said that it was four days. The only thing that Officer McClinton testified to, in response to Mr. Eichner's question at the hearing, was that when Ms. Eichner asked, was there a pattern of activity, or was it a single incident, the officer said, if I can remember correctly, it was, the tipster said it was going on for some time. Does that mean hours, does that mean, and he said, I don't remember what she said for how long. Well, she's been calling multiple agencies trying to get someone to come four days. Those are her words, not mine. I mean, I quoted them, but they're her words. Counsel, this is Judge Costa. I have a question. Assuming you're right that there was an unlawful Terry stop and press, walk me through, and really the fruit of the poisonous tree analysis, the sequence of events that leads to the suppression of the gun found in the car. Thank you, Your Honor. I think that it's important to note that this is akin to a traffic stop, because not only could, if there was no stop, there was no seizure, not only could Mr. Norbert walk away, but he could drive away. So, after Mr. Norbert is patted down, this is when they talk to him. This is when they get the questions answered about his relationship to the car. This is when they find out this other information about prior criminal activity. So, Your Honor, first of all, I think the government waived any argument with respect to fruit of the poisonous tree. That was inevitable discovery argued below, is that right? I saw some talk about that, but it wasn't raised here. It wasn't raised on appeal, Your Honor, and yes, but I think Mr. Aigner did argue below something that alluded to inevitable discovery, but that was not pursued in the government's on appeal. But at any rate, Your Honor, all of those things happened within 15 to 20 minutes of the stop. There was no dissipation, there's no dissipation of the taint. But it does seem likely that the tip described the car. Let's say they never talked to Norbert. Clearly, they could have first, the police could have first gone to the car and just looked around and see what they could see through the windows, right? Well, that's assuming that Mr. Norbert didn't decide to leave. It's certainly a citizen's right when police come. It certainly is ordinary. I'm saying that the first thing they did was just walk to the car. I mean, he wasn't at the car. I understand that's not what happened. I'm just trying to flesh out how this all connects, basically, to the Terry stuff. So, you're saying because he was stopped, he couldn't leave, which meant the car was still there. They looked in the car and saw the gun. Correct, Your Honor. Mr. Jupiter, could you please clarify, in the Navarette case, they talk a lot about the use of the 911 system that records the numbers. Yes. Just to make crystal clear, there is no recording of her number? No recording of her number. So, there was no caller ID or something on their phone? There's nothing in the record to show that this caller was traceable, in contradiction to the cases that the government cites, even the Second Circuit case of Elmore, as well as the other cases where they have names or they have a number when they initiate the Terry stop. So, there was nothing, as well as in Navarette, where they had corroboration that this did, in fact, occur, as Judge Davis pointed out. This was an emergency situation, and the police responded right after the call was made that somebody just ran me off the road, which is very different from saying a conclusive statement that someone is involved in illicit drug activity. Can I ask a question about the trespassing point? Yes, Your Honor. There was evidence that one of the people in the group did, in fact, live there. Whether they had a lease or not, they did, in fact, live there. Is it a violation of the laws in Mississippi to go visit someone at their apartment? No, Your Honor, it's not a violation, and plenty of, I think we all know common sense, plenty of apartment complexes have parking spaces that are designated visitor parking spots. Plenty of them have advertisements, come and see our apartment. We're now leasing, you know. Being in a parking lot for an apartment complex is, the government just did not present evidence of trespassing here, and the police, by the police just saying, we went out there and asked if anybody lived there, and they said, they said, no, that doesn't make out trespassing, not even reasonable suspicion of trespassing. Your Honor, my time is up, and if there are any further questions, I will entertain them. Thank you, counsel. Mr. Eitner? I'm asking regarding the basis for the illegality. I wanted to ask you these questions. My audio is not working properly. Is it true that, I thought I read in the record that one of these gentlemen's father worked for the USF's apartments, and had permission to stay there. If that's the case, then these gentlemen being there doesn't necessarily, isn't necessarily a trespass. And then, also, I wanted to ask you, yes, Your Honor. All these, this trip came in early in the morning, 10 to 12 hours late, that the police went to, the deputies went to this premises, and they patted down each one of these, these so-called suspects. Only one of them had any joint. In my understanding, it was not a salable or marketable amount. It was a very small personal use amount. So, the tip of the, of Norbert, and his friends being selling drugs, was, had become attenuated and disappeared, I believe, before he went over and looked in the car. Why isn't that correct? Thank you for the questions. I heard trespassing, necessarily, and that if there was any verification of the tip, which I doubt, that had been completely attenuated by the finding of no, no salable amount of drugs in one of these individuals. So, Your Honor, I'll take those questions in turn. The first question regarding the possibility of one of those individuals being a lawful occupant. So, what Investigator Levine testified to was that one of the individuals said that their father was a maintenance worker at the apartment and had been letting him stay there. That is not necessarily a lawful tenant. He had been living there, and as Investigator Levine described to him, he referred to him as a squatter. As to the... Well, thank you, if I could, but in connection with that, the anonymous tipster never complained about trespass. Isn't that correct? Yes. They never explicitly said trespassing. They said there were, there was an individual selling drugs in the apartment. And they got much suspicion here with drug activity. That's the reason they went out there, and that was a reason for the pat-down. Is that right? Correct. So, why does it matter that there might have been some other reason to suspect them? Because, again, reasonable suspicion doesn't necessarily need to... It is a totality of a circumstances analysis for one, but also doesn't necessarily need to rule out innocent conduct. But there is a degree of suspicion associated with a group of individuals standing in a dimly lit parking lot who have a tenuous, if any, connection to the apartment complex at all, combined with the information that was provided by this reliable tipster. The whole case has been argued and agreed on the basis of the so-called manager's tip that there was certain activity going on, drug activity, going on at the apartment complex. Right? Yes, Judge. So, Judge Dennis, as to your second question regarding the timing difference. So, they go out there, as Your Honor mentioned, about 10 to 12 hours later. And then, upon arrival, as they... When they do the terry pat-downs of the other individuals, they find a small amount of marijuana. Now, what was described by the individual that actually found the marijuana, which was Officer McClinton, was that the marijuana was... That was a small amount of marijuana, but that was packaged in a manner that was consistent with reason. Again, this was Sergeant of the Heinz County Sheriff's Office, who was over at the... Now, in connection with that, Officer Levine said that it was clearly not nothing that was packaged for resale. Didn't Levine say that? Investigator Levine says that he was aware that someone had found marijuana, but it didn't sound like he had personal knowledge of it. I'm sorry, Judge. I didn't hear the last part of your statement. I said that he was aware of the fact that marijuana had been found, though it didn't sound like he had personal knowledge. He was not the individual that found it. I'm sorry, Judge. Your audio is off. I'm sorry. I'm not asking you whether or not he said he found it. I'm asking you whether or not he said, in his view, it was not packaged for resale, but he also didn't say that it was packaged for resale. He just said it was a small amount of marijuana. I see that my time is up. Do any of the judges have any additional questions they would like to ask? Thank you, counsel. That will conclude the arguments for today. The cases that we've heard are under submission. Thank you. Thank you, Your Honor.